JAMES C. LOYD, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

(BY TWO JUDGES).—1. The principal felon and an accessory before the fact may be jointly indicted in the same indictment with proper averments and charges against each.

2. The form of an indictment, as prescribed by section 4535 of the Revised Code, need not be followed to the letter; it is sufficient if it be conformed to in all material particulars.

3. On the calling of an indictment against a principal and accessory, the Court may require both to answer ready or not ready for trial; if they answer, and the principal be put on trial, it is not error to put the accessory on his trial at the same term of the Court after the conviction of the principal, without any new requirement to announce, unless it appear that some cause for a continuance has happened since the first calling of the case.

4. It is no ground for a new trial that the Court refused to continue, because of the absence of one of the prisoner's counsel, on whom he principally relied, from sickness, the affidavit for continuance only saying that the affiant " had been informed by letter of the sickness; "

especially if it appear that other competent counsel are employed and do appear in the trial.

5. It is not a good ground, for the continuance of the case against an accessory before the fact, to show that the principal felon has been convicted, yet that he intends moving for a new trial.

6. It is no ground of challenge against a juryman that he has formed and expressed an opinion, etc., upon one of the facts necessary to make out the charge against the prisoner, and it is not error in the Court to say, in the presence of the panel, that the formation and expression of an opinion *as to the guilt or innocence of the principal in a crime*, does not, of itself, render them incompetent to sit upon the trial of the accessory before the fact.

7. It is not a ground for a new trial in a criminal case, that the Judge admitted, as evidence before the jury, the written report of a phonographer of the prisoner's statement before the magistrates at the summary hearing previous to commitment, the report being sworn by the phonographer to be true, and the prisoner having full opportunity to examine him thereto before the jury; *it further appearing that the statement was very immaterial*, and that it took the prisoner four hours to make it.

8. When a prisoner undertakes to make a statement before the jury, and he indulges in long, rambling statements of matters wholly immaterial to the matter in hand, so as to consume several hours, and yet say nothing pertinent to the issue before the Court, it is no ground for new .trial for the Court to admonish him that he must confine his statement to matters bearing on the case.

9. It is not error in the Court to charge the jury on the question of insanity, that if one have indulged his passions or blunted his moral sense, so that he can commit crime without remorse, and fails to see its heniousness, as persons of purer morals and more restrained passions see it, this does not make him insane. If he have sufficient capacity to discern right and wrong as to the particular act in question, if he has knowledge and consciousness that the act he is doing is wrong and would deserve punishment, he is of sound mind and memory, so as to be subject to punishment.

10. The verdict, in this case, is not contrary to the evidence nor contrary to law.

11. When, in a murder case, counsel for plaintiff in error arrived late, because he was sick, and it was then discovered that the brief of evidence had not been sent up, time was given to procure it; and, by consent, it was made part of the record, and the case proceeded. (R.) See end of report.   27th February, 1872.

Criminal Law and Pleading.   Before Judge CLARK. Macon Superior Court.   May Term, 1871.

In the same bill of indictment, John R. Holsenbake was indicted for murdering George W. Fish, and James C. Loyd, was indicted for being accessory before the fact. The first count was against Holsenbake, as principal perpetrator, and began and concluded in the forms required by section 4536 of the Revised Code. But the second count, which charged Loyd, while it concluded with " contrary to the laws of said State," etc., as is required by said section, *began* simply, "and that James C. Loyd, etc., omitting the form prescribed in said section : "And the jurors aforesaid, in the name and behalf of the citizens of Georgia," etc. When the cause was called, defendants said they would sever, and the Solicitor General stated that he would put Holsenbake on trial first. He announced ready. The Court asked if Loyd was also ready. His counsel objected to his announcing till Holsenbake was tried. The objection was overruled. Loyd moved for a continuance upon the ground of the absence of Culverhouse, one of his attorneys, making affidavit that Culverhouse was one of his original counsel and an old acquaintance and friend of Loyd, and, therefore, he principally relied on Culverhouse, and that he " was informed by letter that Culverhouse's wife was dangerously ill, and too ill for his attendance on Court." The defendant being represented by other counsel, the motion to continue was overruled. Loyd demurred to the indictment because the count against him did not begin and conclude in the form required by law, and because he and Holsenbake were *jointly* indicted, one as principal and the other as accessory. This demurrer was overruled. Loyd was then sent back to jail, and Holsenbake was tried and convicted. Loyd was then brought out for trial. His counsel moved again to continue because Holsenbake's counsel were preparing a brief of evidence and bill of exceptions in Holsenbake's case, and had filed Holsenbake's pauper affidavit to supersede the judgment against him. The Court refused to continue the cause.

The panel of jurors who tried Holsenbake were discharged. But during his trial many persons were in the Court-room, and heard the evidence in Holsenbake's case. When the first juror was put upon Loyd, the Court instructed him and the other persons of the panel, that the formation and expression of an opinion as to Holsenbake's guilt or innocence did not disqualify them to try Loyd; that they were not disqualified in this case unless, from seeing the crime committed, or having heard part of the evidence delivered on oath, they had formed and expressed an opinion as to the guilt or innocence of Loyd. These instructions were protested against by Loyd's counsel. The jury was impanneled, Loyd's peremptory challenges not having been exhausted. The State introduced the record of Holsenbake's conviction over defendant's objection. The State showed that Fish was killed when, where and in the manner charged, and that certain paper gun-wads were found near his person. One Rasberry testified that Loyd showed him the room in which Holsenbake slept on the night of the killing, and that he found there gun-wads like those found near Fish's body. He further testified that, as a detective, he was concealed in the jail, and overheard a conversation between Holsenbake and Loyd; that Holsenbake asked Loyd if he believed Fish had improper intimacy with his, Holsenbake's, wife, and Loyd stated various things inducing him to that belief, and said he did so believe; that Loyd said Fish had caused his, Loyd's, dismissal from the the post-office; that Holsenbake said, "no one knows of this but us," and Loyd replied that he did not know whether that was true; Holsenbake said if he had loaded the gun with paper instead of those wads there had been no clue to the slayer; when Loyd said he did not see how the wads could furnish a clue, as he had given such wads to many persons, some to negroes. Holsenbake asked Loyd if he did not think his first plan would have been better, and if it would not have been best to kill Mrs. Holsenbake's father first, and Loyd replied "yes, for I thought her father was at the bottom of

the whole difficulty ;" Holsenbake asked Loyd if he did not think it would have been better to have done it at the church, Loyd evaded the question, and whispered, saying he thought he heard some one eavesdropping.   They talked again ; again referred to the wads, and Loyd also mentioned about Fish's having fenced up a road, but stated that he did not have any-thing against him for that.   He asked Holsenbake whether he used his big pistol or his shot-gun, and Holsenbake said he used his gun.   Witness said he had no interest in convict-ing Loyd, he had been a policeman in Atlanta, and had received $100 from the Ordinary of said county as a token of his services, and $215 to pay his expenses from Atlanta. Murphy, another detective, who was also hid with him in jail when said conversation occurred, said he did not hear all the conversation because sometimes they whispered.   Be-cause he did not hear all, the defendant's counsel moved to rule out that part which he did hear, but the Court refused to do so.

The gun and wads were introduced.   The State then read in evidence a copy of Loyd's statement made on the commit-ting trial, which copy the phonographer swore he wrote in short-hand when the statement was made, and afterwards copied correctly.   This was put in over defendant's objection. It appeared that it took Loyd three hours to make it.   It was a review of Loyd's conduct as Postmaster, Revenue Collector and Registrar, and many things wholly impertinent to the issue.   But in it was stated that Holsenbake was, for sometime before the killing, staying at Loyd's house, was very much exercised because his wife had been divorced from him, and blamed Fish for supposed intimacy with her, and threat-ened to kill Fish and her father ; and that Loyd, supposing Holsenbake would do no such thing, jocosely said " yes, kill them all ;" but that when he talked seriously, he told Holsen-bake that such conduct was horribly wicked, etc.   He ad-mitted that Holsenbake got the wads from him, but it appeared

that Loyd was a great hunter and had several guns and much ammunition in his house.

Another witness testified that, after the killing, he applied to Loyd to buy a shot-gun, when Loyd said that witness did not want to buy any gun, but simply to examine or measure his guns, and would not sell one. Another testified that Loyd said he heard his dogs bark furiously just after the shooting, and heard Holsenbake coughing, but that while Holsenbake might have done it, he did not see how he could have been the slayer. There was also evidence that Loyd had said that if five or ten men would join him he would tear down said fence which Fish had built.

The defendant introduced various witnesses to prove that Holsenbake was insane. They stated how he behaved, hanging about the house of his divorced wife, etc., but all stated that they believed that he knew it was wrong to kill any one. Loyd's wife was offered as a witness, but the Court held her to be incompetent.

In rebuttal, Mrs. Holsenbake testified that she had given Holsenbake no reason to suppose she would ever remarry him, but had repulsed him, and explained what little wrtten communications had been had between them since the divorce. The record of the divorce was introduced. The State closed.

Loyd then made a statement which occupied over four hours. It is substantially the same as the other. Whilst he was making it the Court said, "I cannot indulge you in this line of remark. You have stated, perhaps, a thousand things that can have no connection with the merits of the case. You are free to state any and every fact having the least relevancy to the case, and having a bearing on your guilt or innocence, and are invited to do so; but you must condense your thoughts, and bring your mind to bear upon things material and neccessary to be said, to show that you are not guilty, or that Holsenbake is not guilty, and not ramble off upon immaterial subjects. You have spent four hours in your statement which

could have been rendered in a shorter time." The Court charged the jury as follows, reading to the jury the sections of the Code therein marked, defining the crime, etc. :

It is the duty of the State to make out, by proof, to your satisfaction—1. That George W. Fish was murdered by some one in this county. 2. That John R. Holsenbake was the actual perpetrator of the crime, or the person who killed Fish, and that Holsenbake has been guilty of the crime. 3. That Loyd, the defendant, though absent at the time of the killing of Fish, did procure, counsel or command Holsenbake to commit the crime. Murder: Code sections 4254, 4255, 4256, read. Accessory: Code sections 4241, 4242, read.

If the State has shown to your satisfaction that Fish was murdered, that the crime was committed by Holsenbake, that Holsenbake has been covicted by the verdict of a jury, that Loyd was absent at the time of the killing, but that, though absent, he did counsel or procure Holsenbake to kill Fish, then it will be your duty to find Loyd guilty, unless he has shown you that he is not guilty.

The bill of indictment and the verdict of the jury of guilty as to Holsenbake, in the case of The State vs. Holsenbake, as principal, and Loyd as accessory before the fact, is proof conclusive of the fact that Holsenbake is regularly convicted of the crime of murder. The defendant, Loyd, cannot deny this fact.

Such a bill of indictment and verdict of guilty as to Holsenbake, is *prima facie* evidence or presumptive evidence of Holsenbake's guilt. This means that, upon such a bill of indictment and verdict of guilty being introduced, in evidence, by the State, it is not necessary for the State to introduce other evidence of Holsenbake's guilt, but in such a case the burden of showing that Holsenbake was not guilty is upon Loyd.

That bill of indictment and the verdict of the jury is only *prima facie* evidence of Holsenbake's guilt, it is no evidence of Loyd's guilt. The State must make out Loyd's guilt by

the usual modes—that is by such other proof as satisfies you that he is guilty.

The verdict of guilty is also *prima facie* or presumptive evidence that Holsenbake, at the time of the commission of the crime, was not a lunatic, but a person of sound memory and discretion, and capable in law of committing the crime; and if defendant seeks to set up the lunacy of Holsenbake, he must prove it.

The defendant sets up as a defense to this prosecution: 1. That he is not guilty, that if Holsenbake did kill Fish, he, Loyd, did not procure or counsel Holsenbake to commit the crime. If this defense is sustained, or the State has failed to show that Loyd did procure or counsel Holsenbake, then defendant is not guilty, and you should so find.

Defendant, Loyd, further sets up as a defense, that if Holsenbake did kill Fish, Holsenbake was a lunatic at the time, that he was not of sound memory and discretion, and that, if he was a lunatic, he could not be guilty of crime, and if such is the fact, he, Loyd, is not an accessory before the fact, but should have been indicted as the principal perpetrator of the crime, and not as accessory before the fact. He read Code, section 4223. If Holsenbake was a lunatic when he killed Fish, and Loyd caused him to kill him, Loyd should have been indicted as principal and not as accessory. And if such is the fact, you cannot find him guilty as accessory before the fact; and as he is not charged in the bill of indictment as principal, it will be your duty to acquit him by a verdict of not guilty, if you believe that Holsenbake was a lunatic at the time of the killing. But in such a case as this, if Loyd pleads the insanity of Holsenbake as a reason why he should not be convicted as an accessory before the fact, it is his duty to prove the fact to your satisfaction, so that you shall have no reasonable doubt in your mind as to Holsenbake's insanity. If Holsenbake were now on trial, and you had reasonable doubts as to his sanity or insanity at the time of the commission of the deed, you might possibly

Loyd *vs.* The State of Georgia.

give Holsenbake the benefit of the doubt and find him not guilty. But when Loyd pleads it he must remove all reasonable doubt from your minds. He must satisfy you, beyond all reasonable doubt, that Holsenbake was a lunatic. It may be possible for Holsenbake to have raised reasonable doubts in order to have demanded a verdict of not guilty; something more than this is required of Loyd. He must not merely raise doubts of the lunacy of Holsenbake, but he must go further and remove the doubts, and leave your minds without a reasonable doubt. He must clear the mist, and leave you reasonably certain in your minds that Holsenbake was insane. If he so far fails as to leave you in doubt whether Holsenbake was sane or insane, you will be compelled to disregard the plea. There are certain baser passions of our nature which require the constant restraint of a sound and well-balanced judgment to keep them within proper bounds. Unrestrained and uncontrolled they pervert the moral sense, degrade the intellect, and lead to the commission of those offenses and crimes which have, in all ages, demanded the interposition of the law, in order to protect society from their consequences.

Man owes no greater duty to himself than, by the constant use of checks and restraints, to so far subdue the passions as to bring them under the control of the reason and judgment. Whenever he fails to do this, and gives a loose rein to their indulgence, he loses the mastery over himself, at once degenerates to the lowest condition of vice and becomes a dangerous member of society.

These passions grow upon what they feed upon; and when constantly supplied with food from the suggestions of an evil and corrupt nature, they as certainly control us, debase our better nature, make us subject to their unruly behests, as effect follows cause, in the operations of nature; and man descends from his high estate of honor, of integrity and of virtue, to a condition more closely resembling, in his baser nature, the brute creation than the intelligent being whom a wise Creator has made in His own image,

and placed on the earth for wise purposes—purposes not inconsistent with the happiness of man and the glory of his Maker.

Envy is one of these passions. It exists, to a greater or less degree, in the breasts of all people, and when not properly controlled it not unfrequently becomes a consuming flame. It is condemned as a base passion by the good sense and intelligence of the race. Some people are peculiarly under the influence of it, so much as to unfit them from according merit where it belongs. Some men are supposed to be subject to it more than others, so much so at times as to warp the judgment, and impair the moral sense. While its indulgence is disreputable and even sinful, the law cannot interfere. It only interposes when crime results and the envious man has become so much of a slave to his passions as to become a criminal.

Ambition is a strong passion. When directed to good purposes and good ends, it is a prompt stimulant to exertion, and one of the great elements of success, in all the avocations of life. But when released from wholesome control, it soon overleaps all bounds of virtue and propriety. It hesitates at no obstacle in the way of success, but uses the good and bad alike for purposes of its own advancement. The world has been deluged with the blood of millions to promote the ambitious views of unscrupulous men. While the law frequently cannot reach these, its greatest violators, they are, nevertheless, amenable to the unprejudiced and sober verdict of mankind and the impartial Judge of all the earth for the enormity of their crimes and transgressions.

Hatred is another one of the bad passions that spring from the corruptions of the heart. It is condemned by that great moral law which Infinite Wisdom has prescribed for the conduct of man. To hate our neighbor is a crime and a vice against the moral law. But men will hate one another, and, in order to justify this basest of the passions of the heart, will concoct and carry out schemes of mischief that

Loyd *vs.* The State of Georgia.

result in death, and that bring sorrow and grief into inno-cent households.

Jealousy is another one of the passions.   It cannot be said that a reasonably jealous care over the reputation of ourselves, or those who are connected to us by ties of blood or family relationship, is improper.   But it degenerates into a vice when it so far masters the judgment as to become a controlling passion.   Love is a fruitful source of jealousy; and the history of mankind affords numberless instances of men and women who have fallen victims to the unholy indulgence of this passion.   It poisons the affections, contorts the judg-ment, creates unusual and unaccountable suspicions, and prepares the mind for the commission of any crime, how-ever heinous in its character, or destructive in its results.

One of the great objects and purposes of law is to prevent men and deter them from the unbridled indulgence of these passions; and while it cannot destroy them, it can, by wholesome restraints and adequate punishment, force men to keep their passions within reasonable bounds, and under the control of a reasonable judgment, so that no harm can come to others from their indulgence.

We are invested with these passions, and they are permit-ted by the kind Author of our being for wise purposes; they have their proper place in the making up of our moral and intellectual constitution.   The cultivation of the better parts of our nature, and the control of the evil and grosser passions, ennobles man, and prepares him for all the higher and nobler duties of life; while unchecked indulgence in the evil passions debases his nature, and prepares him for the commission of crime of all grades, and renders absolutely necessary the interposition of law, in order to protect society, and save it from the evil purposes of bad men.   But the sinful indulgence of these passions, even until the mind has been poisoned, and the better judgment has been brought under complete control, so that the conscience is blunted,

and the moral senses have lost their acuteness, does not make the man a lunatic.

The thief who has stolen so often and so much as to lose all sense of degradation, and feels no compunction for the crime, is not a lunatic. The jealous man who permitted an evil passion to master him, and who, in consequence, dips his hand in the blood of his victim, is not a lunatic, merely because nothing else will satisfy him but the blood of his rival. The man who hates his neighbor, and who has suffered this evil passion to warp his nature and fire his brain, until he gets his consent to waylay and assassinate the object of his vengeance, is not a lunatic.

To allow for a moment such a plea as this upon the ground that the evil passions had controlled the better parts of man's nature, and that the free indulgence in them had broken down the restraints that every virtuous man uses to control himself, would at once precipitate upon the country the most deplorable results. The wicked man, who has been a prey all his life to evil passions and evil influences, would at once receive a license to practice upon the community the most henious crimes, and, when charged with them, screen himself behind the plea of lunacy. The consequence would be, that the whole country would be flooded with crime— murder, arson, burglary, adultery, and all the offenses known in the calendar of the worst countries, and among the lowest classes of our race. Every man who has his moral senses so far blunted as to allow him to commit crime is not a lunatic. This condition of want of moral sense and blunted perceptions is really the condition of every man who deliberately perpetrates a crime. He does not see the offense, and cannot see it in the same light and with the same disgust that one of more elevated and purer moral sentiments would see it. If, from any cause, the mind is so far diseased that it cannot discern between right and wrong, the perpetrator of a deed, while in such a condition, is a lunatic, and, as a lunatic, he is not responsible for the commission of crime. One who

Loyd vs. The State of Georgia.

is a lunatic cannot commit a crime.  He is not in a state of mind to be responsible either to God or man for his conduct, while in such a state of mental alienation.  Lunacy is a visitation of God; and when God's hand has thus been laid heavily upon the man, and He has drawn a veil over his intellect, so as to destroy the distinction between right and wrong, as to the deed about to be committed, the unfortunate man ceases to be a moral agent, and there is no power to punish him.  Accountability to the law of God and man ceases when reason ceases.  But if reason has its sway so far as to allow him to see and discern the right and wrong of the deed about to be done, and to know that it deserves punishment, he is accountable, both to the law of God and man, for the deed.  The law, upon this subject, is fully and concisely stated by the Supreme Court, in these words: " If a man has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act in question, if he has knowledge and consciousness that the act he is doing is wrong, and would deserve punishment, he is of sound mind and memory, and subject to punishment."  Apply this rule to the case now on trial, and determine this issue according to the facts.

Doubts.  The doubts that are contemplated by the law are such doubts as are reasonable, and such as a reasonable man would entertain.  They must spring up in the mind from the weakness or insufficiency of the evidence.  Mere fanciful doubts, or conjectures that may capriciously float in the mind, are not reasonable doubts.  They are nothing more than caprices of the intellect, not founded on reason or good sense.  Some men believe very few things, and are of a doubting nature as to the character and truthfulness of testimony.  Such men are not reasonable men, and their stubborn disbelief in the existence of facts, in spite of testimony, is unreasonable, and such as the law does not allow.

A reasonable man hesitates when the mind is in such a

state of uncertainty, after carefully examining all the evidence, that it cannot considerately go forward, and find a verdict of guilty. If, after mature consideration of all the facts developed on this trial, you are in this condition of doubt and uncertainty as to the guilt of defendant, you will find him not guilty; but, if you have no such doubts, and entertain a reasonable and satisfactory conviction that he is guilty, you will find him guilty.

The jury found Loyd guilty. His counsel told the Court that they would prepare a brief of evidence, and make a motion for new trial, and carry the case up, but that it would be upon the points taken on the trial, and they did not wish to argue the points. Thereupon the Court proceeded to sentence Loyd.

The motion for new trial was made upon the grounds that the Court had erred—1st. In overruling the demurrer to the indictment. 2d. In requiring Loyd to announce ready before Holsenbake was tried. 3d. In overruling his first motion to continue. 4th. In overruling his second motion to continue. 5th. In instructing the jury that the formation and expression of an opinion as to Holsenbake's guilt or innocence did not disqualify them for trying Loyd. 6th. In admitting said copy of Loyd's statement before the committing magistrate as evidence. 7th. By interrupting Loyd, as he did, when Loyd was making his statement to the jury. 8th. In charging as he did (without specifying what parts of the charge they claim to be erroneous). 9th. In not ruling out Murphy's statement of a conversation, of which he heard but *part*, and because the verdict was contrary to law, etc., founded upon confessions alone, etc. The Court refused a new trial, and error is assigned on said grounds.

(Goode, being sick, arrived late. It then appeared that no brief of the evidence had been sent up. The Court, by consent, passed the case from Saturday till Tuesday, to allow the evidence to be obtained. It was gotten, and, by consent, the record was amended by adding the evidence.)

C. T. Goode; W. S. Wallace; Jack Brown; W. H. Reese, for plaintiff in error.

W. A. Hawkins, Solicitor General, *pro tem.;* Phil. Cook, for the State.    Accessory may be made to plead first: 1 Ch. Pl., 421; 2 Hale's P. C., 223; 4 Hawkins, 219, 245.    Absence of counsel not favored: 18 Ga. R., 383. Indictment good: 37 Ga. R., 50; 10th, 46.    Principal's conviction, ‚its weight as evidence: 7 Ga. R., 2; 10 Peck. 477.

McCay, Judge.

1. That a principal felon and an accessory before the fact may be included in the same indictment, with proper charges and averments against each, seems unquestionable.    Such was the settled rule of the common law: Bullock *vs.* The State, 10th Ga., 47.    And such would seem, in the nature of things, right and proper.    They are, in a very proper sense, joint offenders, both concurring, at least in intent, in the crime.

2. Our Code, even as to the substantial averments in an indictment, only requires that they should be stated so as to be easily understood by the jury : Code, section 4535 ; and it seems directly contrary to the spirit of this enactment to require that the merely formal parts of the indictment shall conform to the letter to a provision the sole object of which was to make unnecessary the cumbrous formality of the common law proceedings.

3. When an indictment against several is called for trial, the whole case, as it stands, is announced.    The defendants are asked if they be ready for trial.    And if any one is not ready, he will be heard.    If there be after this a severance, the Court proceeds to try them severally.    When one has been tried, and his case disposed of, the Court proceeds with the next.    As a matter of course, if any new complication occurs, if anything has, in the mean time, happened that

makes either the State or the accused less ready than at the announcement, the Court will hear and judge of it.   But we see no more reason for a new call, because a trial of one of the joint offenders has intervened, than because any other temporary delay has occurred.

4. We have so often ruled that the granting or refusal of a continuance is in the discretion of the Court, under the special facts of each case, that we do not care to repeat our reasons.   The absence of counsel would seem to be specially within this rule, since it must depend very much on the surroundings how material such absence may be.   The Judge, knowing, as he does, the counsel, and seeing, as he does, all that transpires, has special means of getting at the truth.   In this case, too, there is a serious defect in the evidence as to the reason of the absence of the counsel.   Could any one be punished if the fact should turn out different from what was stated?

5. Until a new trial has been *granted* to the principal felon, he stands convicted.   Even a *supersedeas* of the sentence only leaves matters as it finds them; it does not vacate the finding. The verdict of conviction stands until it is set aside.   We do not think an actual motion—nay, even the granting of a rule *nisi,* would *require* a continuance of the case against the accessory; much less is this the case, when nothing appears but that the principal intends to move for a new trial.

6. The test of the juror's qualification is by the statute, fixed to be his having formed and expressed an opinion as to the *guilt* or INNOCENCE of the accused.   Have the Courts authority to change this test?   If they add to the test made by the law that prepared in this case, where are they to stop? It is very true that the guilt of the principal felon is an estial element in the guilt of the accessory, and one who has formed and expressed an opinion as to the guilt of the principal felon, has formed and expressed an opinion on a very material fact, necessary to be proven in order to establish the guilt of the accessory.   But if the forming of an opinion as

Loyd *vs.* The State of Georgia.

to the truth of one of the necessary facts of the offense is to disqualify a juryman, who could be a juryman in a case of murder? The death of the deceased is, in all cases, a necessary and material fact to be shown. Is a juryman disqualified because he had formed and expressed an opinion as to the fact of the death of the deceased? And the same may be said as to many other facts. It may very well be that the principal felon is guilty, and the person charged as accessory not guilty. We are clear, therefore, that the juryman who has formed and expressed an opinion as to the guilt or innocence of the principal felon, is not, for that reason, disqualified from trying the accessory. Our statute prescribes the tests, forming and expressing an opinion as to the *guilt* or *innocence* of the prisoner, from having seen the crime committed, or from having heard any part of the testimony delivered on oath, prejudice or bias, etc., etc. Nor was it improper for the Judge, in a general way, to instruct the panel as to what the law was in the premises. This Court has approved of the practice, and we think rightly.

7. Perhaps the admission of this phonographic report was not strictly regular. As it did not appear to have been taken down under the direction of the Court, as prescribed by section 4636 of the Code, it cannot stand as a part of the magistrate's report. If admitted at all, it could only be on the faith to be given to it as sworn to at the principal trial by the phonographer, and it is not the usual course to permit a witness to reduce his testimony to writing, swear to it, and have it read as evidence. Though it may also with truth be said, that this phonographic report is by far the best evidence of what this statement really was; certainly it is better than any man's memory of what took place. In this case, the statement is very immaterial; there is nothing in it of confession, nothing that could have damaged the prisoner, and we will not grant a new trial.

8. Something is due, even in a criminal trial, to the public. Is the Court to sit and listen until it pleases the pris-

oner to stop? So long as his statement is pertinent to the issue, and not a continued repetition of what has been said, the Court ought to hear it. Charity and kindness requires much forbearance to one so situated. But even these have their limits, and we do not think the Judge did, in this case, in this matter, more than was proper.

9. We see no material error in the Judge's charge on the subject of insanity. In one sense, all crime is insanity. Indeed, in view of the awful responsibility of all of us to the Judge of the quick and the dead, any sin is a sort of insanity. But as the Judge justly said, society cannot afford to treat a man as insane because he has become so steeped in crime as to have stupefied his conscience. The Judge stated the rule of responsibility, from the words of this Court over and over again repeated, to-wit: Was the accused conscious he was doing wrong? Was his mind sound enough to judge of the right or wrong of his acts?

10. Upon the whole, we think this man guilty; perhaps the most guilty of the two engaged in this terrible tragedy, and affirm the judgment without hesitation. It is painful to be the instrument of the law in meeting out the reward to guilt, but it is a public duty.

Judgment affirmed.