### SMITH *vs.* THE STATE OF GEORGIA.

On a trial for murder, where it appeared that the accused, the deceased and several others were at work on a ditch; that words of an unfriendly character passed between the accused and the deceased; that a quarrel ensued, when the accused left the ditch, procured the handle of a pick, while he held in his left hand a long-handled shovel, and when within ten or twelve feet of the deceased, the quarrel still going on, he threw the pick handle at deceased, and struck him on the head, inflicting a wound from which he died, the court should have given in charge the law of voluntary manslaughter; and a failure so to do will require a new trial, although he charged as to all the other grades of homicide.

(a.) If the killing was without malice, that is, was done without a deliberate intent unlawfully to take human life, then it was not murder. If it was done without malice, upon a sudden heat of passion, it was voluntary manslaughter; and whether it was done with or without malice depends much upon the weapon used. If done without legal provocation, upon a sudden falling out, with an instrument not likely to produce death, the jury might infer a want of malice, and in such case it would be voluntary manslaughter; but if the killing was done upon a sudden heat of passion,

provoked by words and abusive language used by the deceased with a deadly weapon, it would be murder, the weapon used show-ing the intent on the part of the accused to take human life. These questions not having been properly submitted to the jury, a new trial is granted.

JACKSON, C. J., dissented.

April 25, 1884.

Criminal Law. Murder. Manslaughter. Homicide. Before Judge POTTLE. Hancock Superior Court. October Term, 1883.

Wilson Smith was indicted for the murder of Sip. Bennett. On the trial, the evidence was, in brief, as follows: A number of hands, among whom were both defendant and deceased, were engaged in digging a ditch on the plantation of one Dickson. Gilbert Castleberry was "boss" of the squad. He told defendant and others to get into the ditch. Deceased said, " Yes, Smith, get in the ditch." Defendant said, " I am tired of you negroes meddling af-ter me; one boss is enough." Deceased said, " Get in the ditch, Smith." Defendant said, " You were meddling af-ter me Saturday." (This affair occurred on the following Monday.) Deceased said, " What was it I said about you?" Defendant said, " You said my father-in-law had to keep me up and my family." Deceased said, " He does do it." Defendant said, "You are a liar." Deceased said, " You are another liar." Defendant said, " If you say that again, I'll kill you." By that time, defendant had walked down the ditch about eight yards, with a long-han-dled shovel in his hand. Deceased repeated, " He does do it." Defendant jumped out of the ditch and got a pick-handle and said, "Pay me the meal you owe me." Deceased, who was still at work in the ditch, replied, " You owe me as much as I owe you." Defendant replied, " You are a liar." Deceased said, " You are another liar." By this time, defendant had walked to within twelve feet of de-ceased, and started to strike him. Then a few words passed, which the witnesses did not understand, defendant

then threw the pick-handle, struck deceased on the head and knocked him down, where he lay about two or three minutes. He was taken up and carried off, and died on Wednesday morning. As he was being led out of the ditch, he said to defendant, "Bud, I wasn't mad with you; I had no idea you were going to hit me that way." The crowd called out that defendant had struck the man for nothing. He replied, "I knocked him down, and I'll knock another down. I'll fight until I die. I'm no Georgia raised nigger." When deceased received the blow, he was about half bent, shovelling dirt. Defendant was standing on the bank of the ditch over him, about twelve feet distant. Defendant held a shovel in his left hand, when he threw the pick-handle with his right. The shovel was the one he was working with in the ditch, and which he carried out of the ditch with him. He did not strike, or attempt to strike, with the shovel. No pick was on the handle when thrown. The pick-handle was lying on the side of the ditch; the picks had been knocked off that morning by order of Mr. Dickson, in order to have them sharpened.

One witness stated that he knew of no bad feeling between the parties; all seemed peaceful, until deceased said something about defendant's father-in-law "finding" him and his family.

The physician, who attended deceased before his death, gave his opinion that death resulted from the blow, and stated as follows in regard to the pick-handle with which the injury was done: "The pick-handle shown witness is a weapon that would produce death. This stick thrown by one man at another and striking him on the head would not always produce death, and thrown twelve or fifteen feet, I don't think it would be likely to hit a man and to produce death. It would depend on the force used and the place hit."

The jury found the defendant guilty, and he was sen-

v 73-4

tenced to be executed. He moved for a new trial, on the following among other grounds:

(1.) Because the court refused to charge as requested: " Words may justify a battery; and if you believe from the evidence that the prisoner did not intend to kill deceased, but to resent an insult with a battery, with an instrument not likely to produce death, then he is not guilty of murder, but may be guilty of involuntary manslaughter in the commission of an unlawful act, or a lawful act without due caution and circumspection, as you may determine from the testimony."

(2.) Because the court charged as follows: " Whatever of evidence there may be before you of opprobrious words or obusive language, you cannot consider them as a justification, for the law expressly says that provocation by words or contemptuous gestures shall in no case free the person killing from the crime and guilt of murder. It makes no difference who was right or wrong in the use of words or insults. Those words or that language shall not justify the act, nor shall they reduce the crime to manslaughter."

(3.) Because the court charged as follows: " An assault or battery with a bludgeon or stick of such size as, if used on a human being, would likely produce death, is an unlawful act, and if it be used positively and without any intention to kill, but nevertheless death ensues, while, under the definition it would be involuntary manslaughter, under the law, it would be murder."

The motion was overruled, and defendant excepted.

J. T. JORDAN, for plaintiff in error.

C. ANDERSON, attorney general; JAMES A. HARLEY, solicitor general, by HARRISON & PEEPLES, for the state.

BLANDFORD, Justice.

The plaintiff in error was indicted for the murder of Scip. Bennett, tried and found guilty, and made his motion

for new trial on several grounds, which was overruled by the court, and this decision is excepted to, and error is now here assigned thereon.

The testimony in the case shows that the accused, deceased and several others were at work on a ditch. There were words of an unfriendly character between the accused and deceased; a quarrel ensued, when the accused left the ditch and procured the handle of a pick, while he held in his left hand a long-handled shovel; when within ten or twelve feet of deceased, the quarrel going on, he threw the pick handle at deceased, and struck him on the head, inflicting a wound from which he died. The court charged upon all the grades of homicide, except that of voluntary manslaughter. He should have charged also upon this grade of homicide. The evidence in the case made it necessary that the jury should have considered this branch of homicide. If the killing was without malice, that is, it was done without a deliberate intent unlawfully to take human life, then it was not murder. If it was done without malice, upon a sudden heat of passion, then it was voluntary manslaughter; and whether it was done with or without malice depends much upon the weapon used. If done without legal provocation, upon a sudden falling out, with an instrument not likely to produce death, then the jury might infer a want of malice; in such case, it would be voluntary manslaughter. See Foster's Crown law, 291; 61 *Ga.*, 380; Roscoe's Crim. Ev., 695; 1st East's P. C., 236; 1 Russ. on Crimes, 783; 18 *Ga.*, 17; 30 *Id.*, 70. But if the killing was done upon a sudden heat of passion, provoked by words and abusive language used by deceased, with a deadly weapon, it would be murder, because the weapon used would show intent on the part of the accused to take human life. At all events, these questions should have been put fairly before the jury by the court, so that they might determine whether the accused was guilty of murder or voluntary manslaughter.

We express no opinion upon the facts of this case, as

there will have to be another trial of the same, nor is it necessary to notice other assignments of error in the record, as we presume that they may not occur on another trial.

Let the judgment of the court below be reversed.

HALL, Justice, concurred, but furnished no written opinion.

JACKSON, Chief Justice, dissenting.

I am unable to see how, under the law applied to the facts of this case, disclosed in the record and fully reported by the reporter, the case can be reduced from murder to voluntary manslaughter. There was no attempt by the person killed to hurt the defendant, no assault upon him, nor anything equivalent thereto, "to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied." The only provocation was by the words in regard to the support of defendant by his father-in-law, which the law declares "shall in no case be sufficient to free the person killing from the guilt and crime of murder." Section 4325 of our Code absolutely concludes the case. There was proof of express malice. The difficulty of the Saturday before, referred to by the slayer at the time of the killing, shows the malice of the defendant rankling in his breast two or three days.

The case was tried upon the issue whether or not the killing was intentional; or, in other words, was with a weapon likely to produce death. The jury passed on that issue, and, in my judgment, found on it the only verdict possible under the facts. The man killed never raised his head from his work in the ditch; the slayer got up out of the ditch, where he too was at work in another part of it, got a pick-handle from a tree against which it was left leaning, walked deliberately to where the killed was at work, until he got over him in good hurling distance from the top or edge of the deep ditch, thence hurled this pick-

handle, proved to be a weapon likely to produce death, upon the back of the head of the killed, who showed no fight, and offered no resistance, and hurled his soul into eternity. If this be manslaughter, voluntary manslaughter, what is murder? A judgment that the facts can make it less than murder, under any possible construction of them, as between it and voluntary manslaughter, is a naked repeal by the judiciary of the law of the state in section 4325 of the Code. Having no disposition to repeal that law, and no power to repeal it, if so disposed, I am constrained to dissent from the judgment of the majority of this court, and to express my concurrence with the view of the care taken by the able and experienced circuit judge who presided on the trial. No request was made of him to give the jury in charge the law of voluntary manslaughter. No idea that voluntary manslaughter was in the case appears to have been in anybody's mind pending the trial; it was the clutch of a dying man at a straw, after he had caught at everything else during the trial; that clutch, in the persistent grasp of his able and energetic counsel, has magnified the straw into a life-preserver, so far as this conviction by this jury has been overturned; and thus kept above water for another struggle, he may reach the shore of safety.

Whilst my duty to the law, as I understand it, will not permit me to look at the straw through such a magnifying glass, but to see it only with the naked eye of unexaggerated truth, and descry what the visible thing actually is in its insignificance, I admire the persistence of that intellectual force which has worked a marvel so great, and decline to comment further on the facts, lest I might say something which might deprive the defendant of that fair and unprejudiced new trial to which this court decides he is entitled.

That trial will be upon facts *de novo;* and upon them and any new facts, together with such light as they may throw upon the old, of course I express no opinion. I

look only on this case now made on this record, and hold that upon it the judge of the superior court committed no error in overruling the motion for a new trial.