MIZE v. THE STATE.

1. Objection that a grand juror was a non-resident is a challenge propter defectum, and must be made before verdict. If the ground of challenge be unknown to defendant and his counsel until after the verdict, and

from conflicting evidence the court decides that the grand juror had not changed his residence and was a qualified grand juror, it is not error to refuse a new trial on this ground.

2. In every criminal case the State's counsel has the right to open and conclude the argument, except where the defendant introduces no evidence. On a trial for murder the defendant is not entitled to open and conclude by admitting the homicide and offering to prove his justification.

3. The idea of prevention, or defense against an impending or progressing wrong, must enter into all cases of justifiable homicide. To deliberately kill in revenge for a past injury, however heinous, after reason has had time to resume its sway, can not be justifiable.

4. Under the facts of this case the court should have charged the law of voluntary manslaughter.

5. There was no error in any of the rulings upon evidence.

OCTOBER 18, 1910.

Indictment for murder. Before Judge Morris. Milton superior court. May 21, 1910.

*G. B. Walker* and *Mozley & Moss,* for plaintiff in error.

*H. A. Hall, attorney-general,* and *J. P. Brooke, solicitor-general,* contra.

EVANS, P. J. Tom Mize was convicted of the murder of Mack Walker, and was refused a new trial. From the case as made by the evidence it appears that the deceased, Mack Walker, with his two sons, John and Willie, and a neighbor, John Hardeman, left his home on the morning of the 20th of February to go hunting. Within a few minutes after they left, the defendant came to their home and inquired for the deceased and his son John. He was told that they had just gone hunting; whereupon he said that he would see if he could find them, and directed his wife, who was with him, to return to his home. The defendant overtook the hunting party, and upon approaching them engaged in casual conversation with John Walker and Hardeman. The defendant then called to the deceased to come up to them, stating that he had some questions to ask John, his son, and wished the deceased to hear the conversation. The deceased, the defendant, and John Walker walked off a few steps at the request of John. When out of the hearing of Hardeman the defendant asked John Walker where he was on the Tuesday before from eleven till four o'clock; to which John Walker replied that he was "in several different places." The defendant then asked if the defendant's daughter was with him during the time; and upon being told that he had been with her, the defendant drew his pistol, remarking "She

won't be anymore," and immediately fired at John Walker, the shot taking effect in his side. John ran as·he was shot, and the defendant then shot Mack Walker twice, killing him almost instantly.

In his statement before the jury the defendant said that he had lost an eye a short time previously, and was sitting around the house. At noon when he went in to dinner his daughter, a 16-year-old girl, who usually sat by him at the table, did not appear. His family did not know where she was. After dinner he went to the home of the deceased and inquired if she had been there, and was informed that she had not. He said to the wife of the deceased, "I am ruined;" to which she replied, "May be not; why do you say that?" The defendant replied, "Looks like the children want to slip off, or has done it." He then returned to his home, got his pistol and put it in his pocket, and searched the premises in the vicinity of his home. While near an old outhouse in a field he saw a boy who informed him that he had seen a girl and a boy run out of the house and run back across the old field, but he didn't know who they were. He then conceived the idea that she had run away and married John Walker, and to verify this surmise he made investigation in the ordinary's office to ascertain whether a license had been issued, and also made inquiry as to whether any one had seen John Walker and his daughter. No license had been issued, and he saw no one who had seen the couple about whom he was inquiring. He then returned home and found his daughter there, and asked her where she had been. She replied, "Nowhere," to which he responded, "You are a liar." He then told her that he would whip her if she did not tell him where she had been. She refused to tell him anything, and he then whipped her, but elicited no information. That night the deceased came down to defendant's home to inquire if Dinah, his daughter, had come home. The defendant told him she had, and asked the deceased, "Do you ·know anything about it?" to which deceased replied, "No." Defendant then said to him, "Do you know anything that will do me any good?" The deceased replied, "Just a little time will wear it out and get better." The next morning he made further investigations, but discovered no facts. He returned home that night still distressed, did not undress, and slept about three hours. On the next morning he

took his children and went into the woods to chop wood.  He had cut down a tree and was sawing it when Dinah came down and said to him, "Pappy I will saw for you—I just want to."  He left the woods, returned to his home, took his wife and went to the home of the deceased, and inquired for deceased and his son John, and was told that they had gone rabbit-hunting.  One of the smaller children of deceased told him that he thought the hunting party had gone down the branch, and he went in that direction and heard the dogs running, and proceeded until he came up with them.  When he reached the hunting party a young man named Hardeman and John Walker were sitting on a stump, and the deceased and a younger son were fifty or sixty yards away.  The Hardeman boy asked the defendant why he did not have a gun, and he told him he could not see a rabbit as far as those briars (indicating).  He spoke a word or two about hunting; then he called the deceased, saying, "Come this way a minute;" and when the deceased came up there he said, "How are you getting on?"  The defendant replied, "Pretty bad; how are you?"  The deceased then said, "I am getting along pretty well."  The defendant then said, "I want to ask John a few questions, and I want you to hear what I ask him."  He said, "All right."  Defendant then turned to John and said, "John I want to know where you were from eleven until four o'clock day before yesterday?"  To which John replied, "If you want to know the truth, come right up here and I will tell you."  John and the defendant and the deceased then moved off about twenty steps, when John said to the defendant "What do you want?"  The defendant replied, "Where were you from eleven till four o'clock day before yesterday?"  John Walker said, "I was at a half a dozen different places."  The defendant then said, "I don't care anything about that, you know what I want."  John replied, "Yes."  The defendant then said, "I want to know if you were in the old field in that old house with Dinah."  To which John replied, "Yes, I was; and I aint ashamed or afraid to own it."  The defendant then jerked out his pistol and said "You won't be there any more."  John immediately turned to run, and the defendant fired.  The deceased had his gun on his shoulder, and when the defendant fired at John he jerked it down and presented it towards the defendant, who fired upon the deceased twice, inflicting wounds from which he immediately died.

1. One of the grounds for new trial was that a grand juror, whose name appeared in the indictment, was a non-resident of the county, of which fact he and his counsel were ignorant until after the trial. The indictment was returned at the March, 1910, term of the superior court, and an affidavit was presented in which the affiant deposed that during an interval between the last revision of the jury-box and the return of the indictment, the grand juror had lived in an adjoining county. The grand juror by affidavit deposed that he never had changed his residence, but that temporarily he lived in the adjoining county, while looking for a permanent position. If the grand juror moved out of the county with no intention of changing his residence, he did not lose his citizenship and was a competent juror. Besides, the objection to the grand juror comes too late. The non-residence of a grand juror is ground for challenge propter defectum, and can not be made after verdict. *Folds* v. *State,* 123 *Ga.* 167 (51 S. E. 305); *Wall* v. *State,* 126 *Ga.* 549 (55 S. E. 484).

2. On the threshold of the trial, and before the State had submitted any evidence, defendant's counsel proposed to the court that the defendant would admit that he killed the deceased and assume the burden of proving that the homicide was justifiable, and would claim the right to open and conclude the argument. The court ruled that upon making such admission the defendant would not be entitled to open and conclude, but that the defendant might make the admission if he desired; whereupon counsel replied that he offered to make the admission only upon condition that his request to open and conclude the argument was granted. The point of this exception is emasculated by the defendant's failure to admit the homicide; yet, as the court ruled upon the effect of such admission as bearing on the defendant's right to open and conclude the argument, we will consider the correctness of the ruling. The plea of confession and avoidance of the civil procedure has no place in criminal pleading. It takes two elements to make a crime,—act and intention. A legally sufficient indictment charges a crime,—an act in the commission of which the defendant's criminal intent has entered. An admission of such allegations would be in effect a confession of the criminal act—the equivalent of a plea of guilty. The burden of proof in every case is upon the State to show the defendant's guilt beyond a reasonable doubt, and the

statutory provision is that the State's counsel shall open and conclude to the jury, except that if the defendant shall introduce no testimony his counsel shall open and conclude after the testimony on the part of the State has closed. Penal Code, § 1029. The ruling was in accord with the statute.

3. The jury were instructed that if the defendant shot at John Walker with the intent to kill him, or commit a felony upon his person, and this was done in revenge for the debauchery of the defendant's daughter, and the deceased attempted to defend his son from such assault, and the defendant shot and killed the deceased in resentment of the son's conduct, he would be guilty of murder, even though the deceased was at the time attempting to shoot him. The purport of this charge is, that, if the defendant slew the deceased solely to avenge the debauchery of his daughter by the son of the deceased, the homicide would be murder. Our Penal Code enumerates various instances in which a man will be justifiable in taking the life of another. Penal Code, §§ 70-73. After providing for these specific instances the Penal Code declares: "All other instances which stand upon the same footing of reason and justice as those enumerated shall be justifiable homicide." In all of the enumerated instances a marked characteristic, involving the principle and reason upon which justification depends, is that the killing must be necessary, either real or apparent, as a measure of prevention. As was said by Bleckley, C. J., in *Farmer* v. *State,* 91 *Ga.* 727 (18 S. E. 990) : "As these several characteristics either expressly or by plain and manifest implication mark each and every one of the enumerated instances, and as they are characteristics involving the principle and reason on which justification depends, they must, as matter of law, be present in each and every one of the non-enumerated instances in order to put the latter on the same footing of reason and justice with the former. These characteristics are the very things which make up the reason and justice of the enumerated instances; for in penal law the distinction between prevention and revenge is fundamental. Aggressive acts perpetrated to avenge a past injury are never justifiable." If the defendant made a felonious assault upon the son of the deceased, such as to justify the father in protecting the person of his son, the defendant could not claim that the deceased was the aggressor in defending the felonious as-

sault upon his son. Nothing is ruled in *Biggs* v. *State,* 29 *Ga.* 723 (76 Am. D. 630), to the contrary. In that case the person assaulted had made improper proposals to the wife of the accused in his presence on the previous night. The accused threatened to punish him if he should remain in the city. He was shot on the next morning, as he took his seat at the breakfast-table near the wife of the accused. In discussing the admissibility of the evidence as to what occurred on the night prior to the assault, and the correctness of the charges that "Under no circumstances of aggravation, however gross or direct, would a man be justifiable in taking the life of another who attempts the seduction of his wife," some very strong language is used in the opinion. Notwithstanding these strong and forcible expressions, the ruling in this case has not been considered in conflict with later rulings, to the effect that a husband may attack one for intimacy with his wife in his presence, where the circumstances raise a reasonable belief that the criminal act is in progress or about to begin; that the law will not justify killing for deliberate revenge, however grievous the past wrong may have been; that that law does not trust its punishment to individual vengeance. *Gossell* v. *State,* 123 *Ga.* 434 (51 S. E. 394) ; *Patterson* v. *State,* 134 *Ga.* 265 (67 S. E. 816) ; *Hill* v. *State,* 64 *Ga.* 453.

4. Complaint is also made that the court failed to charge upon the law of voluntary manslaughter. If the defendant, suspecting that his daughter had been debauched, sought out the author of her ruin for the purpose of avenging the wrong, and killed him solely in resentment for the past injury, the crime would be murder; but if the circumstances attending the homicide were equivalent to an actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, and were such as to justify the excitement of passion and to exclude all idea of deliberation or malice, the crime would not be murder, but would be manslaughter. In all cases of voluntary manslaughter there must be both such provocation as the statute provides and passion. The provocation must come from an assault or an attempt to commit a serious personal injury, or from circumstances which are equivalent to an assault or an attempt to commit a serious personal injury. The defilement of a daughter is more likely to arouse the resentment of a father

than an actual assault upon his own person. If the parent deliberately slays one who has debauched his daughter, in revenge of the wrong, the killing is murder; but if upon discovery of the wrong inflicted upon his daughter, and under circumstances sufficient to arouse an uncontrollable passion and to exclude all idea of revenge, the parent suddenly kills the person who has debauched her, the homicide is manslaughter. *Hill* v. *State,* 64 *Ga.* 453; *Mays* v. *State,* 88 *Ga.* 399 (14 S. E. 560). It is the passion, under provocation, which extenuates the crime; and what is cooling time is for the jury to determine. The provocation may be a single act; or fresh provocation of the person slain may be such as to extend the initial provocation to the time of the homicide, so as to excite a sudden and uncontrollable passion. If the defendant's passion had been excited because of a well-founded belief that some person had illicit intercourse with his daughter, and if the burning fire of passion, which had become latent from the uncertainty of the person, suddenly became passionately aflame because of the boastful statement of John Walker that he had been in the old outhouse with his daughter, it would be for the jury to say whether these circumstances were sufficient to deeply arouse the passion of an average rational mind. So, if the defendant had killed John Walker under these circumstances, the jury would have been authorized to find the defendant guilty of voluntary manslaughter. It is the absence of malice which differentiates manslaughter from murder. If at the time of the killing the circumstances are such as to exclude malice, then the homicide can not be murder. So, if the defendant, acting under the impulse of irresistible passion, provoked by the conduct of the son, fired upon the son, and the deceased, who was present with the son, knowing of the provocation, immediately attempted to protect his son from a felonious attack by the defendant, and the defendant coincidently fired upon the deceased to save his own life, the killing in defense of the father's attack, though not justifiable, is not necessarily murder; but such facts authorize a charge on the subject of voluntary manslaughter.

5. There was no error in the rulings on evidence, and it is not necessary to notice points which will not arise on the next trial.

*Judgment reversed. All the Justices concur.*